## Case No. 10,131.

### The NEVADA.

[17 Blatchf. 122.] 1

Circuit Court, S. D. New York. Aug. 28, 1879.2

COLLISION IN NARROW SLIP — OCEAN STEAMER LEAVING MOORINGS WITHOUT AID OF TUG—LOOKOUT.

1. A large ocean steamer has no right to leave her moorings in a narrow slip crowded with other craft, by the use of her own propeller, without taking the utmost care to prevent accidents by the disturbance of the water which necessarily follows.

2. She must maintain complete control of herself, and, if she cannot get out by the use of her own propeller, without doing damage to other vessels that are lawfully moored near her, she must employ a tug.

3. In leaving the slip, she must keep a lookout astern, and over her side, into the slip, if necessary.

[Appeal from the district court of the United States for the Southern district of New York.]

This was a libel in rem, in admiralty, filed in the district court. After a decree in favor of the libellants, the claimants appealed to this court. The decision of the district court, (Blatchford, J.,) was as follows:

"The libel in this case is filed by Sergeant J. Quick, as master and owner of the canal boat Kate Green, for himself and for F. A. McKnight, against the steamship Nevada. The Kate Green and a cargo of corn on board of her were sunk in the slip between piers 46 and 47, North river, in the city of New York, on the 27th of September, 1871, by a collision between her and the Nevada. The cargo was insured by the Western Insurance Company of Buffalo, which paid the loss, and its interest is vested in McKnight. The Nevada, a screw steamer, was moored at the north side of pier 46, lengthwise of the pier, with her bow towards the river, and, about 3 p. m., in full daylight, she steamed from her berth and went out and down the river and out to sea. The Kate Green was in the slip, and was, by the suction caused by the revolution of the screw of the Nevada, drawn into contact with the blades of the screw, as it revolved, so that the blades made holes in the bottom of the Kate Green and let in water, which caused her to sink, with her cargo, in a very short time. No person on board of the Nevada knew of the occurrence until she reached Liverpool, which was her destination. The libel alleges, that the Kate Green was properly and securely moored and fastened, and that the collision occurred through the negli-

---

1 [Reported by Hon. Samuel Blatchford, Circuit Judge, and here reprinted by permission.]

2 [Affirmed in 106 U. S. 154.]

gence of those in charge of the Nevada, and not through any neglect on the part of the Kate Green, her master and crew. The libel claims for a total loss of the canal boat and her cargo. The answer alleges, that the Kate Green was made fast, by her bow only, to a floating grain elevator which lay alongside and to the south of a steamer which was lying at the south side of pier 47; that the stern of the Kate Green was not fastened to anything; that between the Kate Green and said steamer there were two canal boats and another elevator; that the Kate Green remained thus made fast until the hour arrived for the Nevada to sail; that her master was notified of the approaching departure of the Nevada, and was warned that the boat was not properly moored, and was exposed to danger from the departure of the Nevada; that, notwithstanding said warning, he neglected to take the steps necessary to secure the boat: that the Nevada, at the hour appointed, left her berth, and, moving slowly and carefully, proceeded out into the river; that, previous to and while so leaving her berth, the steam whistle was blown, the bells on deck were rung, and all usual and proper precautions were taken to announce said departure and to avoid collision with the several lighters and canal boats lying in the slip; that, as the natural and ordinary result of the movement of the Nevada through the water, and of the action of her screw, the water was sucked or drawn towards the Nevada, and the stern of the canal boat, so allowed to remain unfastened, was thereby drawn over to the side of the Nevada, and struck against the Nevada with a violent blow; also, that the collision was occasioned solely by the negligence of the master and crew of the Kate Green, and by reason of her said improper and insufficient mooring. The fair reading of the answer is, that the situation and insufficient mooring of the Kate Green were seen and known by those on board of the Nevada, that the Kate Green was warned in respect thereto, that she neglected to moor herself more securely; that, after such warning was given, those on the Nevada saw that the Kate Green did not moor herself more securely, and saw that she continued to be insufficiently moored; and that, nevertheless, the Nevada, with full knowledge that the natural and ordinary result of the action of her screw, as she would move ahead, would be to suck or draw the water, and with it the unfastened portion of the Kate Green, over to the Nevada, put her screw in motion, and kept it in motion, until the collision occurred, in consequence of such drawing over of the Kate Green until she struck the Nevada. A clearer case of negligence on the part of the Nevada could not well be set forth. Much evidence is given as to the mooring of the Kate Green; as to whether she was fastened at all by lines to anything; and as to how she was fastened, if she was fastened. I deem it unprofitable to discuss or determine those questions, and many other questions as to which evidence was given.

"The case is easy of solution on plain propositions. If the Kate Green was loose in the slip, and not fastened at all, her condition ought to have been seen by and known to those on the Nevada, and it was negligence in them to set the screw of the Nevada in motion, under such circumstances that the Kate Green could be drawn over against the Nevada by the suction of the screw of the Nevada. And this is true whether the Kate Green was warned or not, and whether, when warned, she was loose or was only insufficiently fastened. And it is true whether the warning came from the Nevada or from elsewhere. Indeed, an unheeded warning from the Nevada, given before the Nevada set her screw in motion, so far from relieving the Nevada from fault, only serves to make her fault in starting her screw more clear, as showing that she had her attention called to the perilous condition of the Kate Green, and yet set her screw in motion. If the Kate Green was fastened, she was so fastened that she was at such a distance from the Nevada, that, after she began to be drawn over by the suction of the moving screw of the Nevada, there was abundant time for the Nevada to have stopped her screw and avoided the collision, if there had been a proper lookout kept in the proper place on board of the Nevada. The fact, that no one on board of the Nevada knew or heard of the accident till she had crossed the ocean, tells the whole story. It is abundantly proved, that, as the Kate Green was being drawn over by the suction of the moving screw of the Nevada, the Nevada was hailed from the Kate Green to stop her screw, but no heed was paid to the hail, by the Nevada, because there was no person in a position on the Nevada to hear the hail. Whatever observation was made by those on the Nevada, of the position of the vessels in the slip, preparatory to the sailing of the Nevada, and whatever warning she gave by any hails to any boat in the slip, were made and given, on the evidence, at a time before the Kate Green had come into the slip. Indeed, the answer does not aver that any oral notice or hail or warning was given to the Kate Green by any one on board of the Nevada. As there was fault on the part of the Nevada, causing damage to the cargo of the Kate Green, and as the Nevada alone is sued in this suit for such damage, and as no fault, if any, of the Kate Green, can be imputed to the cargo, there would have to be a decree against the Nevada in respect to the cargo, even if the Kate Green also were found to be in fault for the collision. As to the boat herself, I do not find that she was in fault. If she was loose, not fastened, she was not in fault for remaining so, whether warned or not, because it was the duty of the Nevada to see her condition and not to put her screw in motion. If the Kate Green was fastened, she was fastened at a distance from the Ne-

vada which allowed abundant time, if her fastenings parted, for the Nevada, with a proper lookout, to stop her screw, after the Kate Green began to be drawn over. In either view, the Kate Green, in fact, hailed the Nevada, after the suction began to take effect, in season for the Nevada to have stopped her screw and saved the collision, if an officer of the Nevada had been stationed in a proper place, to observe the condition of the Kate Green and to hear the hail. There must be a decree for the libellant, as to both boat and cargo, with a reference to ascertain the damages." [Case unreported.]

This court found the following facts: "About three o'clock in the afternoon of September 27th, 1871, the steamship Nevada left her berth in the slip between piers 46 and 47, North river, New York, on a voyage to Liverpool. She was one of a line of ocean steamers plying regularly between New York and Liverpool, owned by an English corporation of which Williams & Guion were agents in New York, and, previous to her departure, lay on the north side of pier 46, with her bow toward the river, and her stern toward the bulkhead. The slip was two hundred and five feet wide, pier 46 six hundred and thirty feet long, and pier 47 six hundred and twenty-four. On the opposite of the slip, and on the south side of pier 47, lay the steamship Queen, also with her bow toward the river, and her stern toward the bulkhead. The bow of the Nevada was about thirteen feet back from the end of her pier, and that of the Queen fifty-two feet six inches from the end of hers. Two floating grain elevators lay alongside of, and moored to, the Queen; one named the Scotia, at one of the forward hatches, and the other, named the Metropolitan, at one of the after hatches. The canal boat Sarah and Madonna, lay alongside of the Metropolitan, with her stern toward the bulkhead, and was being unloaded into the Queen. At her stern lay the canal boat C. H. Hart, with her bow toward the bulkhead, and extending some distance beyond the Metropolitan. Her stern was made fast by a line to the Metropolitan, and her bow by another leading to the deck of the Queen. She was waiting her turn to be unloaded. One or more boats lay alongside the Scotia, and moored to her, and there were two lighters at the bulkhead, astern of the Nevada. The length of the Nevada was three hundred and fifty-five feet, and her beam forty-three feet, four inches. The length of the Queen was three hundred and eighty-one feet, and her beam forty-two feet four inches. The Metropolitan was about eighty-seven feet long, and her width twenty-four feet. The C. H. Hart was ninety-six feet long, and her width seventeen feet, four inches. Just as the Nevada was starting, the canal boat Kate Green, owned and commanded by the libellant Quick, came into the slip, in tow, on the port side, of the tug Jacob Sinex, and was placed alongside the C.

H. Hart. Her master, Quick, made a line from her bow to the bow of the Hart, and her steersman another from her stern to the stern of the Hart. While this was being done, the tug let go and commenced backing out of the slip, but she had only time to get under the stern of the Kate Green, or a little beyond, when the Nevada started. Previous to the time the Kate Green came into the slip, full public notice had been given by those in charge of the Nevada, that she was about to depart, and particular notice was also given to all the boats then alongside the Queen, including the C. H. Hart. When the Hart came in she was sent up the slip, in order that she might keep out of the way. The Nevada had been advertised to sail at that hour. Her bells had been rung, and her whistles blown, several times. Signals, indicating that she was about to depart, were flying at her mast-head. She took out, on that voyage, a considerable number of cabin and steerage passengers, and there was about her decks and on her pier, all the bustle and noise which usually accompanies the sailing of a large ocean steamer. The Kate Green was not seen from the Nevada when she came in, and no special notice was given to her that the Nevada was about to leave. She had no time, after her arrival, to give particular attention to what was being done on board of the Nevada, or on the pier. All the bells were rung and whistles blown before she arrived, or while the attention of those on board was given to making her fast and getting away from the tug. Neither was there time for her master to examine particularly the fastenings of the Hart. The Nevada started almost simultaneously with her getting alongside the Hart, and the first actual notice she had that the Nevada was about to leave was when the propeller commenced moving. If she was, in fact, made fast at the time, it had only just been done. She lay about sixty feet from the Nevada. The tide was flood, and running up by the ends of the pier, pretty strong. When the Nevada started, the revolution of her propeller and her own motion caused a displacement of the water in the slip, and a suction, which drew the Hart and the Green away from where they were lying, and broke the bow fastenings of the Hart. As soon as this was done, the Green swung rapidly towards the Nevada. Her master, who was on deck, called loudly to the Nevada to stop the propeller, but he was not heard, or, if heard, not heeded. The Nevada kept on without stopping, and the revolving blades of her screw struck the Green under the water line, and a little aft of the port bow, inflicting such an injury as caused her, the Green, to sink soon after, with her cargo on board, and some articles of furniture, &c., belonging to her owner. No one on board of the Nevada knew of the parting of the Hart's lines, or of the swinging of the Green, or of the accident, until after she arrived in Liverpool.

If a man had looked from her deck over her side into the slip, he could not have failed to see what was going on all the time from the first movement of the propeller, and before, until she got out. There was an abundance of time, after the breaking of the fastenings of the Hart, and after the Green began to swing, and after the hail of her master, to have stopped the propeller, before the collision. The report of the commissioner as to the damages, is warranted by the evidence, and the libellant, McKnight, was the owner of the claim for damages when the libel was filed."

E. H. Lewis, for libellants.

Stephen P. Nash and George C. Holt, for claimant.

WAITE, Circuit Justice. There are many palpable errors in the testimony in this case, but the material facts, as found, are satisfactorily proven, and are sufficient, as I think, to charge the Nevada with fault. A large ocean steamer has no right to leave her moorings in a narrow slip crowded with other craft, by the use of her own propeller, without taking the utmost care to prevent accidents by the disturbance of the water which necessarily follows. The natural effect of the revolution of her propeller is to draw towards her stern all objects near by, movable in the water, and that, added to the displacement of the water, by the movement of the vessel herself, in such a slip, makes it the duty of the officers and men responsible for her navigation to be specially vigilant, and to keep the vessel completely under their control, until all danger is past. Other vessels have the right to come into the slip and moor themselves. She has an equal right to be there, and to start on her voyage when she is ready, but she cannot, with impunity, cause damage to other vessels lying near, by any neglect of her own navigation in going out. She must watch for, and, if necessary, give warning of danger.

Some witnesses have testified that the Kate Green was told, when she came in, that the Nevada was about to leave, and sent up into the slip to get out of the way, but, upon the whole evidence, it is manifest to my mind they were mistaken, and that they counfounded the Green with the Hart, which arrived a short time before, and which, undoubtedly, was warned. I do not entertain a doubt, that the Green got into the slip without being noticed from the Nevada, or by any one charged in any manner with her navigation. The entire attention of those on board the Nevada, officers as well as men, so far as I can discover, was directed towards her and to getting her away from her pier, and into the stream, without injury to herself. No notice whatever was taken of the other vessels in the slip, and no one was set to look out for danger on the other side of the vessel, or at the stern, when it ought to have been known that much damage might be done to the neighboring vessels by the screw, if from any cause they got loose from their moorings. This I cannot but consider, under the circumstances, a gross fault. With the large number of competent officers and men which the prudent and successful navigation of such a vessel required on board, there was no difficulty in providing men for the performance of that duty, and, if they had been at their posts, the Green would have been seen, as she approached the slip, and stopped outside, or sent up into the slip with her tug, away from danger, to wait until the Nevada had gone. The fastenings of the Hart might have been strengthened, to meet the additional strain caused by the presence of the Green alongside, or, when the boats broke away, and the Green swung over, the propeller might have been stopped until she could have been got away. I know that, since the appeal, testimony has been taken to show that it would have been unsafe to stop the propeller after the steamer had started, because of the effect of the tide upon her bow when it got outside the end of the pier. If this was really so, of which I am by no means certain, it was a fault in the steamer to start without making provision to counteract the effect of the tide, in case it became necessary to stop. The rule hardly admits of an exception, which requires a steamer moving by her own power, in a crowded and narrow slip, to maintain complete control of herself. She is not likely to be put in a situation, during her entire voyage, where other vessels will be exposed to so much danger from her movements as there, and, if she cannot get out by the use of her own propeller, without doing damage to other vessels that are lawfully moored near her, she must employ a tug.

An attempt has been made to prove that the steamer broke a hawser leading from her to her pier, as she went out, and that her stern swung away from the pier and out into the slip. The testimony on both these points is very conflicting, and it is not easy to say what the actual facts were; but, in the view I take of this case, they are unimportant. The real fault of the steamer was in not keeping a lookout astern, and over her side, into the slip. The office of a lookout is to watch for the approach of danger, and he should be stationed where he can best do what is required of him. At sea, danger is most to be looked for ahead, and the lookout takes his place at the bow; but, in a crowded slip, there is as much, and oftentimes more, use for him at the stern, or over the side, than at the bow. Under such circumstances, it is as important to keep men stationed there, as at sea it would be forward. Thus much for the Nevada.

At first, I was inclined to think the Kate

Green was also at fault, but, on further reflection, have reached a different conclusion. In The City of Paris [Case No. 2,767], a case like this in many of its features, I held a canal boat responsible equally with the steamer, and divided the damages, because the canal boat was insufficiently moored; but, there, the steamer was known to be about to sail long before she started, and the captain of the canal boat ought to have known that the boat alongside of which he was moored was not securely fastened. Besides this, he lay within twenty-five feet of the steamer, and a very little change of position would bring the vessels together. Here, however, the Kate Green had no actual notice that the steamer was about to leave, and I am by no means satisfied that she was securely made fast to the Hart before the propeller was set in motion. If there had been time enough, she might have seen, by the indications on the steamer or the pier, that the steamer was about to start, but, in passing into and along the slip, she was cut off from any view of what was going on. If she had had time, also, she might have seen that the Hart was not sufficiently fastened to hold the two boats; and it is possible, that, but for this, the rule acted upon in The City of Paris [supra], might, with propriety, be applied here. But, upon the case as it stands, I think the whole fault must be charged on the steamer. Had she kept her proper lookout, and given the necessary warning, all defects in the mooring of the canal boat could have been avoided.

The delay in filing the libel is sufficiently explained, and no change has taken place in the ownership of the Nevada since the loss. The suit, therefore, is not barred by lapse of time. While there may have been some difficulty in obtaining testimony, caused by the length of time which elapsed between the occurrence and the trial, the facts on which the case turns, if not admitted, are not seriously contested.

There is no complaint as to the amount of damages allowed by the commissioner, except in relation to the value of the canal boat, and in that I think the preponderance of evidence is in favor of the report.

A decree may be prepared in favor of the libellant Quick, for three thousand one hundred dollars, and interest at six per cent. from September 27th, 1871, and in favor of the libellant McKnight, for five thousand eight hundred and sixty $^{61}/_{100}$ dollars, with like interest from the same date, and for costs.

[On appeal to the supreme court, the decree of the circuit court was affirmed. 106 U. S. 154, 1 Sup. Ct. 234.]